IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

HENRY AUGUSTUS DUPONT,
    Plaintiff,

vs.                                                            Case No.: 3:15cv246/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
    Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

       This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 4, 5).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for  disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

       Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.        PROCEDURAL HISTORY

On October 17, 2011, Plaintiff filed applications for DIB and SSI, and in each application he alleged disability beginning October 5, 2011 (Tr. 20).[1] His applications were denied initially and on reconsideration, and thereafter he requested a hearing before an administrative law judge ("ALJ"). A hearing was held on September 10, 2013, and on January 24, 2014, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (Tr. 20–30). The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.     FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* Tr. 20–30):

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on July 28, 2015 (ECF No. 7). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

1) Plaintiff meets the insured status requirements of the Act through December 31, 2016[2];

2) Plaintiff has not engaged in substantial gainful activity since October 5, 2011, the alleged onset date;

3) Plaintiff had the following severe impairments: coronary artery disease ("CAD"), diabetes mellitus, and neuropathy;

4) Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5) Through January 24, 2014, Plaintiff had the residual functional capacity ("RFC") to lift and/or carry twenty pounds occasionally and ten pounds frequently. Plaintiff retained the ability to stand and/or walk one hour at a time and no more than three to four hours in an eight-hour day. Plaintiff could occasionally balance, operate foot controls, climb stairs and ramps, stoop, kneel, crouch, and crawl but never climb ladders, ropes, or scaffolds. Plaintiff could perform no work at unprotected heights or with dangerous machinery. He could occasionally work in temperature extremes, humidity, and wetness.

6) Plaintiff was capable of performing his past relevant work as a courier. This work did not require the performance of work-related activities precluded by his RFC;

7) Plaintiff was not under a disability, as defined in the Act, from October 5, 2011, through the date of the decision.

III. STANDARD OF REVIEW

---

[2] Thus, the time frame relevant to Plaintiff's claim for DIB is October 5, 2011 (date of alleged onset), through January 24, 2014 (the date the ALJ issued her decision). The time frame relevant to his claim for SSI is October 17, 2011 (the date he applied for SSI), through January 24, 2014. *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file).

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125

F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

Case No.: 3:15cv246/EMT

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052

(11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL AND MEDICAL HISTORY[4]

    A.   Personal History

Plaintiff testified at the September 10, 2013, hearing that he worked at U-Haul on a part-time basis, as much as 30 hours per week, starting in 2009 and continuing through the time of the hearing in 2013 (Tr. 44–45, 49–50). After his 2011 heart attack, Plaintiff returned to work but was given "light duty" tasks such as driving a truck and performing custodial jobs that were not as strenuous (Tr. 48–49). Plaintiff said he did not work as many hours as he used to, usually four hours per day, after which he would arrive home exhausted (Tr. 49). He stated that he had decreased stamina because of his chest pain and that he was told not to lift over five pounds (Tr. 49–50). Plaintiff stated that the heat makes him weak but that he can drive as long as the vehicle has air conditioning (Tr. 51). He stated that he drives three days out of the week and rides the bus for the remainder of the days (Tr. 54).

---

[4] Unless otherwise noted, the information in this section is derived from the ALJ's opinion (*see* Tr. 20–30).

Case No.: 3:15cv246/EMT

Plaintiff additionally provided that his diabetes causes a lot of pain in his legs (Tr. 51, 54). He testified that he no longer performs daily household chores because when he gets home he has no energy. He indicated he attends church sometimes with his sister and visits with friends and family (Tr. 51–52). He stated that dust and fumes affect his conditions and he has problems remembering things (Tr. 53–54). Plaintiff indicated that his diabetes adversely affects his stamina and that it sometimes causes dizziness and paralysis in his leg (Tr. 54). Plaintiff stated that he can stand for 30 minutes at a time and that he rests frequently when at work, taking at least seven breaks lasting 15 to 20 minutes each (Tr. 54–55). He mentioned that his employer allows him to take these breaks because he does "more work than the other people" (Tr. 55).

B.   Relevant Medical History

Plaintiff's medical history includes myocardial infarctions that required stents in 2003 and 2009 (Tr. 264–314). On October 4, 2011, Plaintiff went to the emergency room at Sacred Heart Hospital with complaints of shortness of breath and decreased stamina. The shortness of breath was described as severe and had been occurring intermittently over the preceding week; Plaintiff reported that after taking 20 steps he would have to stop and rest due to the shortness of breath and fatigue (Tr. 348). Plaintiff was "noted to be in heart block . . . with a concern of the possibility he was ischemic . . ." (Tr. 266). As Andrew S. Kees, D.O., later described:

> Left ventricular function actually had improved, estimated ejection fraction 60% with discrete inferior hypokinesia. There was a chronic subtotal occlusion to the previous bare metal stent to the first obtuse marginal, a widely patent distal RCA stent with no other significant disease. He was then seen by Dr. Verma who on 10/05 placed a dual-chamber pacemaker without event. He was watched on the ward over 24 hours. Chest x-ray showed 110 pneumothorax and he was discharged on 10/06.

(Tr. 266).[5]

On October 18, 2011, Plaintiff again presented to the emergency room with complaints of shortness of breath and minor chest discomfort (Tr. 318–19). Plaintiff's pulmonary and cardiovascular systems were found to be stable, and he was released in stable condition (Tr. 318, 320, 331).

Plaintiff had a follow-up office visit on October 31, 2011, with Dr. Kees, during which he reported that he felt "well with much more energy. . . no angina" (Tr. 369). Dr. Kees' impression was "CAD/Coronary Atherosclerosis, Unspecified Vessel: Worsened since last seen. Chronic. I have made no changes to the present regimen." (Tr. 370). Also noted were Plaintiff's high cholesterol, which was seen as stable; hypertension, which was seen as benign but worsened since "last seen"; and diabetes mellitus, which was noted to be uncomplicated (Tr. 370). Previous to this October 31

---

[5] As is relevant to this Order, Dr. Kees' comments were provided later, on October 10, and reflect the diagnoses and procedures implemented by Sumit Verma, M.D., and F. James Fleischhauer, M.D., who were actually in attendance while Plaintiff was at Sacred Heart Hospital (Tr. 266–67, 270, 273). It does not affirmatively appear that Dr. Kees saw Plaintiff at the hospital.
Case No.: 3:15cv246/EMT

visit, the record reveals that Plaintiff was "last seen" by Dr. Kees on July 15, 2011 (Tr. 372–74). During that visit, Plaintiff reported no chest discomfort, palpitations, or any other such symptoms, and Dr. Kees described Plaintiff's CAD/Coronary Atherosclerosis and his old myocardial infarction as stable (Tr. 372–73).

On December 14, 2011, Plaintiff was seen by Rogelio Samson, M.D., his primary care physician, whose cardiovascular findings were all normal (Tr. 346).

On February 8, 2012, Dr. Kees completed a Treating source Cardiac Questionnaire in which he indicated that Plaintiff had no limitations in standing, walking, sitting, lifting, or carrying as it relates to his cardiac condition (Tr. 410). Dr. Kees further stated that Plaintiff retained an "ability to maintain a normal pace and sustain physical activities" (Tr. 410). During office visits in March and April of 2012, where Drs. Kees and Verma both saw Plaintiff, his symptoms were seen as stable. During his March 16, 2012, visit, Plaintiff reported that he was working full time at U-Haul without any limitations in activity, to which Dr. Verma instructed in response that Plaintiff avoid "heavy lifting to avoid damage to the pacemaker leads" (Tr. 421). On March 21, 2012, Plaintiff requested evaluation for high blood pressure, for which he was provided different medication (Tr. 418–19). On April 18, 2012, Plaintiff's blood pressure was improved (Tr. 416). On October 2, 2102, Dr. Kees again saw Plaintiff and noted his conditions all to be stable (Tr. 430–32).

On October 13, 2012, Plaintiff presented to an emergency room complaining of chest pain (Tr. 490).  The pain was described as "unexplained discomfort between the nose and naval that lasted continuously for more than 10 minutes" (Tr. 491).  Also noted was fainting with "unexplained severe weakness dizziness or fatigue" but "no symptoms that the patient thinks might be a heart attack" (Tr. 491).  Plaintiff was diagnosed with unspecified chest pain and directed to follow up with Dr. Kees that week and to undergo a stress test (Tr. 493).

On October 17, 2012, Plaintiff again presented to the hospital emergency room with complaints of shortness of breath and chest pain (Tr. 463).  Medical notes indicate that Plaintiff reported that his abdomen tightened when his blood pressure became elevated (Tr. 464).  Examinations, including an EKG and x-ray, revealed no abnormalities, however (Tr. 466).  He was advised to arrange to take a stress test (Tr. 467).  Plaintiff was then discharged, and he drove himself away from the hospital (Tr. 468).

After his emergency room visits, Plaintiff was seen on November 14, 2012, by Dr. Kees, who noted: "He has had no chest discomfort suggestive of ischemia.  The patient denies orthopnea, PND, DOE, or edema.  Mr. Dupont [] has not had palpitations, syncope or near syncope." (Tr. 442).  Accordingly, Plaintiff was kept on essentially the same treatment regimen (Tr. 442–44).

On May 6, 2013, Plaintiff was seen by Dr. Verma. Other than an issue with Plaintiff's blood pressure, which was the result of his running out of his medication, Plaintiff presented with normal symptoms, and a follow-up appointment was set up for a year thereafter (Tr. 458–59). On June 28, 2013, Plaintiff, having presented to urgent care for sinus problems, was seen by Physician's Assistant Roxanna Benton. Neither chest pain nor shortness of breath was noted to be present, however (Tr. 456). On July 22, 2013, Plaintiff was again seen by Dr. Kees, who again noted the absence of chest discomfort, palpitations, syncope, or any other related symptoms (Tr. 515).

On August 5, 2013, Dr. Kees completed a RFC assessment for Plaintiff (Tr. 523–24). Dr. Kees found Plaintiff to be able to lift less than five pounds frequently but never five pounds or more (Tr. 523). He found Plaintiff able to stand or walk less than one hour and sit for two to four hours during an eight-hour day (Tr. 523). Dr. Kees determined that Plaintiff would be restricted from climbing but not from bending or with respect to fine/gross manipulation (Tr. 523). Dr. Kees provided that Plaintiff would require three rest periods of thirty minutes during the day and that his impairments or treatment would cause him to miss approximately two days of work per month (Tr. 524). Dr. Kees nevertheless concluded that Plaintiff was not disabled from full-time continuous employment (*id.*).

The record also contains a May 7, 2012, Disability Determination Explanation from James Patty, M.D., who concluded that Plaintiff had the capacity to perform light work (Tr. 94). Dr. Patty determined that Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; sit, stand, and/or walk for about six hours during an eight-hour day; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and frequently stoop, kneel, crouch, and crawl (Tr. 92).

V.   DISCUSSION

Plaintiff first contends that the ALJ erred in his decision to "not afford great weight" to the RFC assessment made by Dr. Kees. Substantial weight should be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Comm'r of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or

Case No.: 3:15cv246/EMT

is wholly conclusory.  *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

While recognizing that Dr. Kees had established a treating relationship with Plaintiff, the ALJ nevertheless found Dr. Kees' RFC findings to be "clearly inconsistent with the objective medical evidence and notably, his own medical findings" (Tr. 28).  Indeed, other than Plaintiff's two emergency room visits in October of 2012, the medical record reflects relative medical stability and little in the way of respiratory or cardiovascular symptoms after Plaintiff's last surgery in which his pacemaker was inserted.  During this time, Dr. Kees saw Plaintiff a number of times and noted his largely stable condition, and in fact Plaintiff was actively working throughout the time.  Thus, the ALJ found: "Dr. Kees's opinion does not support the degree of functional limitations as expressed in his medical source statement. Furthermore, the undersigned [ALJ] notes the claimant is clearly able to perform more than this range of work since he is already doing it in his current job." (Tr. 28).  The

ALJ's finding that Dr. Kees' RFC opinion is contrary to the record, including Dr. Kees' own earlier medical impressions, is well supported in the record, and therefore the ALJ's discounting of Dr. Kees' opinion is well-supported.

Plaintiff asserts that the ALJ was guilty of "acting as h[er] own expert" by mentioning in support of her position the fact that Plaintiff had a sixty percent "ejection fraction" (Tr. 23, 27). Plaintiff also contends that the ALJ was "picking and choosing" when she cited the ejection fraction but did not address the fact that Plaintiff had an occluded obtuse medial artery. Plaintiff does not object to ALJ's mention of the ejection fraction in and of itself, but he faults the ALJ for appearing to assess the sixty percent fraction as a "good" finding and for highlighting it and not the occlusion finding.

In summing up Plaintiff's medical condition, the ALJ stated:

> In terms of his CAD ["coronary artery disease"] and heart condition, a review of the record reflects that these conditions have stabilized, but he should not be doing anything strenuous. The claimant apparently has suffered heart attacks in the past requiring stenting and recently a pacemaker implantation, which clearly suggests that the symptoms were genuine. However, medical records status post October 2011 through 2013, clearly reflect a progressive improvement in his condition with stabilized blood pressure, CAD and consistently normal pacemaker functioning. The claimant's condition is clearly stable and he has successfully responded to treatment and medication. The most recent studies show ongoing CAD, but it is accommodated for by the stent procedures and the pacemaker. As mentioned earlier, the most recent cardiac testing showed a good ejection fraction of 60 percent. The

> record reflects no recommendation by [an] examining or treating physician that the claimant requires or would benefit from an additional surgery. The record additionally reflects no intensive treatment or ongoing physical therapy related to this condition nor has there been any required inpatient hospitalizations directly related to this condition after his procedure in October 2011. As mentioned earlier, the claimant has presented [to] the hospital emergency room on a couple of instances since his last procedure in October 2011 with alleged chest discomfort and shortness of breath; however, all examinations consistently showed no acute findings and generally negative physical status findings. Clearly, in light of the claimant's stable condition and relatively negative examinations, the undersigned reasonably finds the claimant retains the capacity to perform at least, light work activities and tasks.

(Tr. 27).

As the ejection fraction was mentioned alongside other medical findings indicating that Plaintiff's cardiovascular health was improving after his pacemaker operation was completed, it is arguably a logical step to say that Plaintiff's sixty percent fraction was indeed a positive result. The Commissioner cites an online article from the Mayo Clinic providing that a sixty percent ejection fraction is within the normal range (ECF No. 12 at 10). While the court will limit its review to the medical evidence properly within the record, it does stand to reason that a seasoned ALJ might be familiar with a simple percentile scale and therefore recognize that a particular reading is in the normal range of that scale. Plaintiff cites case law to state that an ALJ "may not 'play doctor' by substituting her own uninformed medical evaluations for that of a medical professional." Sneed v. Comm'r of Social Sec., No.

6:13–cv–1453–Orl–TBS, 2015 WL 1268257, at *6 (M.D. Fla. Mar. 19, 2015) (citing Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992) (Johnson, J., concurring))). While this may be true especially where the ALJ herself interprets—or reinterprets—raw data of a complicated nature or data that needs expert evaluation, simple or commonsense inferences may be permissible. Castle v. Colvin, 557 F. App'x. 849, 853–54 (11th Cir. 2014) ("[W]here the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment") (quoting Manso–Pizarro v. Sec'y. of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996)); *cf.*, Sneed, 2015 WL 1268257, at *6 (finding that the ALJ impermissibly interpreted medical evidence when she contravened the opinion of a handful of doctors about what the raw medical evidence in the case, such as MRI scans, showed). In this case, the court finds that, to the extent that it could be found that the ALJ interpreted the ejection fraction reading, it was of the commonsense variety.

More importantly, in the context of the whole of the ALJ's analysis, the ejection fraction finding was a relatively minor factor among many. As the ALJ described, the overriding sense of Plaintiff's medical history shows long-term improvement and relative stability. More telling than the simple number of an ejection fraction, or the fact that a stented artery showed some occlusion, is the fact that Plaintiff's symptoms

and overall health outlook were stable for the near two-year span from his pacemaker implantation to the ALJ's hearing. Plaintiff may complain that the ALJ failed to specifically mention the occluded artery, but Plaintiff does not show how this particular finding contributed in any specific way to his symptoms or impairments.[6] The ALJ accounted for his CAD while assessing his RFC; her assessment, or non-assessment, of Plaintiff's ejection fraction and arterial occlusion are not substantially dispositive in the context of the record as a whole. On the contrary, the record, as summarized by the ALJ above, provides substantial support for her RFC decision.

Next, Plaintiff contends that the ALJ relied upon "suspicion" to draw conclusions regarding Plaintiff's functional capacity, particularly her conclusion that Plaintiff's "work activity . . . indicate[s] that [his] daily activities have, at least at times, been somewhat greater than [he] has generally reported" (Tr. 26). As the Commissioner asserts, however, it is wholly appropriate to consider a claimant's work

---

[6] As the Commissioner points out, diagnoses alone are insufficient to establish a disability. The severity of an impairment "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986); *see also* Russell v. Astrue, 331 F. App'x 678, 681 (11th Cir. 2009) (rejecting claim where plaintiff asserted that her high blood pressure caused her to be disabled but failed to point to any documentation in her medical records demonstrating how it might so cause disability); Moore v. Barnhart, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) (holding that "[t]o a large extent, [the plaintiff] questions the ALJ's RFC determination based solely on the fact that she has varus leg instability and shoulder separation. However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard").

Case No.: 3:15cv246/EMT

or daily activity while determining the claimant's credibility. *See* 20 C.F.R. §§ 404.1529(c)(3) and (4); Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996). The ALJ was allowed to weigh Plaintiff's activities and the details about his work duties—to which Plaintiff freely testified (Tr. 44–55)—against Plaintiff's own statements regarding his physical capacities. The ALJ's statements in this regard are well supported; Plaintiff's assertion that the ALJ was operating under mere suspicion is without foundation.

Last, Plaintiff argues that the ALJ impermissibly engaged in "sit and squirm jurisprudence" when she noted from her observations at the hearing that Plaintiff appeared to sit comfortably throughout it (Tr. 25). It is true that an ALJ is not permitted to consider a claimant's appearance and demeanor at the hearing as the *sole basis* upon which to reject the medical evidence and testimony in the case, nor may she "impose [her] observations in lieu of a consideration of the medical evidence presented." Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); *see also* Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987); Jarrell v. Comm'r of Social Sec., 433 F. App'x 812, 814 (11th Cir. 2011). In the instant case, the ALJ made only the lone comment referenced above regarding Plaintiff's appearance at the hearing, as one factor among others while determining the credibility or extent of Plaintiff's

symptoms. The Court therefore finds that the ALJ did not err in commenting on Plaintiff's demeanor at the hearing.

VI.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F.3d at 1439; <u>Foote</u>, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**, that this action is **DISMISSED,** and that the clerk is directed to close the file.

At Pensacola, Florida this 22nd day of September 2016.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**